BRACEY et al. v. DARST, State Auditor of West Virginia, et al.

(District Court, N. D. West Virginia.  December 5, 1914.)

1. COMMERCE (§ 57*)—CONSTITUTIONAL LAW (§§ 240, 276*)—REGULATION OF BUSINESS — DUE PROCESS OF LAW — CONSTITUTIONALITY OF "BLUE SKY LAW"—"DOMESTIC INVESTMENT COMPANY"—"FOREIGN INVESTMENT COMPANY."

Act W. Va. Feb. 11, 1913 (Laws 1913, c. 15; Code 1913, c. 55B), known as the "Blue Sky Law," provides in section 1 that "every corporation, every copartnership, every company, every individual, and every association" with certain exceptions as to banks, insurance companies, etc., which sells or negotiates for the sale of "any stocks, bonds, debentures or other securities of any kind" other than bonds of the United States, or of other political or municipal corporations, or "notes secured by mortgages on real estate within the state," to any person in the state, shall be known as "domestic investment companies," or "foreign investment companies" if organized in another state or a foreign country. It then provides that it shall be unlawful for any such company to do any of the business specified in section 1, without first applying to the State Auditor,

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

making a showing of financial condition and solvency and obtaining a license, for which a fee is charged. It is also required to make annual reports, and penalties are imposed to be enforced by criminal prosecution for violation of the act. *Held* that, in view of its explicit and unambiguous language, the act cannot be construed as applying to corporations alone, and that as applied to individuals, partnerships, or voluntary associations of individuals, it is in violation of the Constitution of the United States and invalid as abridging their right as citizens to contract, thus depriving them of their property without due process of law, denying them the equal protection of the laws, and imposing a restraint and burden on interstate commerce.

[Ed. Note.—For other cases, see Commerce, Cent. Dig. §§ 72–76, 88, 90, 92–102; Dec. Dig. § 57;* Constitutional Law, Cent. Dig. §§ 688, 692, 693, 697–699, 845, 846; Dec. Dig. §§ 240, 276.]

2. COMMERCE (§ 15*)—SUBJECTS OF INTERSTATE COMMERCE—STOCKS, BONDS AND SECURITIES.

Stocks, bonds, debentures, and other securities are subject-matters of interstate commerce.

[Ed. Note.—For other cases, see Commerce, Cent. Dig. §§ 17, 34, 35; Dec. Dig. § 15.*]

3. CONSTITUTIONAL LAW (§ 207*)—PRIVILEGES—CITIZENS OF SEVERAL STATES —CORPORATIONS—"CITIZEN."

Corporations are not "citizens" within Const. U. S. art. 4, § 2, providing that the citizens of each state shall be entitled to all the privileges and immunities of citizens in the several states.

[Ed. Note.—For other cases, see Constitutional Law, Cent. Dig. §§ 625–648; Dec. Dig. § 207.*

For other definitions, see Words and Phrases, First and Second Series, Citizen.]

Woods, Circuit Judge, dissenting.

In Equity. Suit by Smith H. Bracey, Howie Mining Company, W. R. Covert, C. E. Wyatt, Augustus Tyler, and Charles La Due against John S. Darst, Auditor of the State of West Virginia, A. A. Lilly, Attorney General of the State of West Virginia, and R. L. Addleman, Prosecuting Attorney for the County of Ohio, West Viriginia. On motion for preliminary injunction. Motion granted.

John A. Howard and J. M. Ritz, both of Wheeling, W. Va. for plaintiffs.

A. A. Lilly, Atty. Gen., Frank Lively, Asst. Atty. Gen., and C. B. Johnson and C. M. Hanna, both of Charleston, W. Va., for defendants.

Before PRITCHARD and WOODS, Circuit Judges, and DAYTON, District Judge.

DAYTON, District Judge. [1] This hearing is had under the provisions of section 266 of the Judicial Code of the United States (Comp. St. 1913, § 1243), upon application of the plaintiffs for a temporary injunction to restrain the state officers, named as defendants, from prosecuting criminal proceedings against the individual plaintiffs for alleged violations of an act of the Legislature approved February 11, 1913, commonly known as the "Blue Sky Law."

The act is charged to be unconstitutional, invalid, and void: (1) Be-

cause it deprives them of their rights to sell in the state of West Virginia valuable stocks, bonds, and securities, which is depriving them of their property without due process of law; (2) that it denies the plaintiffs and each of them of the equal protection of the laws as guaranteed to them under the fourteenth amendment to the federal Constitution; (3) that it imposes a burden and practically amounts to prohibition of interstate commerce, contrary to section 8 of article 1 of the Constitution of the United States; (4) because it attempts to vest in and delegates to the Auditor of the State legislative, executive, and judicial powers in violation of the Constitution of West Virginia, and especially section 1, art. 5, thereof.

The terms of the act so assailed are:

"Section 1. Every corporation, every copartnership, every company, every individual and every association, (other than state and national banks, surety or guaranty companies, trust companies, and duly authorized insurance companies, real estate mortgage companies, dealing exclusively in real estate mortgage notes, building and loan associations, and corporations not organized for profit), organized or which shall be organized in this state, whether incorporated or unincorporated, which sell or negotiate for the sale of any stocks, bonds, debentures, or other securities of any kind or character other than bonds of the United States, or of some county, district or municipality of the state of West Virginia, and notes secured by mortgages on real estate located in this state, to any person or persons in the state of West Virginia, shall be known for the purpose of this act as a domestic investment company. Every such investment company organized in any other state, territory or government shall be known for the purpose of this act, as a foreign investment company. In all respects, other than those covered by this act, such foreign investment companies shall be governed by the law of this state applicable to non-resident corporations.

"Sec. 2. Before offering or attempting to sell any stocks, bonds, debentures, or other securities of any kind or character, other than those specifically exempted in section one of this act, to any person or persons, or transacting any business whatever in this state, except that of preparing the documents hereinafter required, every such investment company, domestic or foreign, shall file in the office of the auditor of this state, together with a filing fee of two dollars and fifty cents, the following documents, viz.: A statement showing in full detail the plan upon which it proposes to transact business; a copy of all contracts, bonds, or other instruments which it proposes to make with, or sell to, its contributors; a statement which shall show the name and location of the investment company, and an itemized account of its actual financial condition, and the amount and location of its property and liabilities, and such other information touching its affairs as said auditor may require. If such investment company shall be a copartnership or an incorporated association, it shall also file with the auditor a copy of its articles of copartnership or association, and all other papers pertaining to its organization, and if it be a corporation organized under the laws of this state, it shall also file with the auditor a copy of its articles of incorporation, constitution and by-laws, of any and all resolutions under which any contracts are to be made with contributors, or securities issued for sale, and all other papers pertaining to its organization. If it shall be an investment company organized under the laws of any other state, territory or government, incorporated or unincorporated, it shall also file with the said auditor a copy of the laws of said state, territory or government, under which it exists or is incorporated, and also a copy of its charter, articles of incorporation, constitution and by-laws and all amendments thereof which have been made, and all other papers pertaining to its organization. No investment company which is a non-resident corporation shall be entitled to receive the license to transact business in this state provided by law until it shall have complied in all respects with the provisions and requirements of this act.

"Sec. 3. All of the above described papers shall be verified by the oath of a member of the copartnership or company, if it be a copartnership or company, or by the oath of a duly authorized officer, if it be an incorporated or unincorporated association. All such papers, however, as are recorded, or are on file, in any public office shall be further certified to by the officer of whose record or archives they form a part, as being correct copies of such record or archives.

"Sec. 4. Every foreign investment company shall also file with the auditor its written consent, irrevocable, that actions may be commenced against it in the proper court of any county in this state, in which a cause of action may arise, or in which the plaintiff in such suit may reside, by the service of process on the auditor of this state, and stipulating and agreeing that such service of process on such auditor shall be taken and held in all courts to be as valid and binding as if due service had been made upon the company itself, according to the laws of this or any other state, and further expressly authorizing such auditor to accept service of any process, order or notice against such company, issued from any court in this state and agreeing that such acceptance of service shall have like force and effect as is above provided for service thereof upon such auditor, and such instrument shall be authenticated by the seal of said foreign investment company and by the signature of a member of the copartnership or company, if it be a copartnership or company, or by the signatures of the president and secretary of the incorporated or unincorporated association, if it be an incorporated or unincorporated association, and shall be accompanied by a duly certified copy of the order or resolution of the board of directors, trustees or managers of the corporation or association authorizing the said president and secretary to execute the same.

"Sec. 5. It shall be the duty of the auditor to examine the statement and documents so filed, and if said auditor shall deem it advisable he shall have made a detailed examination of such investment company's affairs, which examination shall be made under the supervision of said auditor, and such examination shall be at the expense of such investment company, as hereinafter provided. And if the said auditor, upon his investigation, finds that such investment company is solvent, that its articles of incorporation or association, its constitution and by-laws, its proposed plan of business and proposed contract or securities contain and provide for a fair, just and equitable plan for the transaction of business, and in his judgment promises a fair return on the stocks, bonds, debentures and other securities by it offered for sale, said auditor shall issue to such investment company a statement reciting that such company has complied with the provisions of this act; that detailed information in regard to the company and its securities is on file in the auditor's office for public inspection and information: that such investment company is permitted to do business in this state; and such statement shall also recite in bold type that such auditor in no wise recommends the securities to be offered for sale by such investment or security company. But if said auditor finds that such articles of incorporation, or association, charter, constitution and by-laws, plan of business, or proposed contract contain any provisions that are unfair, unjust, inequitable or oppressive to any class of contributors, or if he decides from his investigation of its affairs that such investment company is not solvent and does not intend to do a fair and honest business, and in his judgment does not promise a fair return on the stocks, bonds, debentures, or other securities by it offered for sale, then he shall notify such investment company in writing of his findings, and it shall be unlawful for such company to do any further business in this state until it shall so change its constitution and by-laws, articles of incorporation or association, its proposed plan of business and proposed contract, and its general financial condition, in such manner as to satisfy the auditor that it is solvent, and its articles of incorporation or association, its constitution and by-laws, its proposed plan of business, and proposed contract are bona fide, and provide for a fair, just and equitable plan for the transaction of business, and does in his judgment promise a fair return on the stocks, bonds and other securities by it offered for sale.

All expenses paid or incurred and all fees or charges received or acquired for the filing and examination of any report required hereunder, or for any examination authorized to be made hereunder, shall be reported in detail by the said auditor, and a full account rendered and made thereof.

"Sec. 6. It shall not be lawful for any investment company, either as principal or agent, to transact any business in form or character similar to that set forth in section one of this act, except as provided in section two, until it shall have filed the papers and documents, and received from the auditor the statement above provided for. No amendment of the charter, article of incorporation, or constitution and by-laws of any such investment company shall become operative until a copy of the same has been filed with the auditor of this state as provided in regard to the original filing of charters, articles of incorporation, constitution and by-laws, nor shall it be lawful for any such investment company to transact business on any other plan than that set forth in the statement required to be filed by section two of this act, or to make any contracts other than the one shown in the copy of the proposed contract required to be filed by section two of this act, until a written statement showing in full detail the proposed new plan of transacting business, and a copy of the proposed new contract shall have been filed with the auditor in like manner as provided in regard to the original plan of business and proposed contract, and the consent of the auditor obtained to the proposed change in the plan or contract.

"Sec. 7. Any investment company may appoint one or more agents, but no such agent shall do any business for said investment company in this state until he shall first register with the auditor of this state as agent for such investment company, and for each of said registrations there shall be paid to the auditor the sum of one dollar. Such registration shall entitle such agent to represent said investment company as its agent until the first day of July following, unless such authority is sooner revoked by the auditor; and such authority shall be subject to revocation at any time by said auditor upon notice to the holder for cause appearing to him sufficient.

"Sec. 8. Every investment company, domestic or foreign, shall file at the close of business on June thirtieth and December thirty-first of each year, and at such other times as may be required by the auditor, a statement verified by the oath of at least two members of the copartnership or company, if it be a copartnership or company, or by the oath of a duly authorized officer, if it be an incorporated or unincorporated association, setting forth in such form as may be prescribed by the said auditor, its financial condition and the amount and description of its assets and liabilities, and furnishing such other information concerning its affairs as said auditor may require. Each regular statement of June thirtieth and December thirty-first shall be accompanied by a filing fee of two dollars. Any investment company failing to file its report at the close of business on June thirtieth and December thirty-first of each year or within ten days of that date, or failing to file any other or special report herein provided for within thirty days after the issuance by the auditor of notice or request therefor, shall forfeit its right to do business in this state, and the auditor shall thereupon revoke the statement in favor of such company provided for in section five of this act.

"Sec. 9. The general accounts of every investment company, domestic or foreign, doing business in this state, shall be kept by double entry, and such company, its copartners or managing officers, shall at least once a month make a trial balance of such accounts, which shall be recorded in a book provided for that purpose; such trial balance and all other books and accounts of such company shall at all times during business hours, except on Sundays and legal holidays, be open to the inspection of stockholders and investors in said company, or investors in the stocks, bonds or other securities by it sold or offered for sale, and to the state auditor and his assistants.

"Sec. 10. The auditor of this state shall have general supervision and control, as provided by this act, over any and all investment companies, domestic or foreign, doing business in this state, and all such investment companies shall be subject to examination by the said auditor, or his duly authorized assistants, at any time the said auditor may deem it advisable.

The rights, powers and privileges of the state auditor in connection with such examinations shall be the same in all respects as is now provided with reference to the examination of insurance companies; and such investment company shall pay the expense of such examination, and the failure or refusal of any investment company to pay such expense, upon the demand of the auditor or his assistant, shall work a forfeiture of its right to do business in this state.

"Sec. 11. Whenever it shall appear to the said auditor that the assets of any investment company doing business in this state are impaired to the extent that such assets do not equal its liabilities, or that it is conducting its business in an unsafe, inequitable or unauthorized manner, or is jeopardizing the interests of its stockholders, or investors in stocks, bonds, or other securities by it sold or offered for sale, or whenever any investment company shall fail or refuse to file any papers, statements or documents required by this act, without giving satisfactory reasons therefor, said auditor shall at once communicate such facts to the Attorney General who shall thereupon apply to the circuit court of the county in which such company is located or is doing business, or to the judge of such court in vacation, for the appointment of a receiver to take charge of and wind up the business of such investment company, and if such fact or facts be made to appear, it shall be sufficient evidence to authorize the appointment by the court of such receiver and the making of such orders and decrees in such case as equity and the proper protection of the interests of investors may require.

"Sec. 12. Any person who shall knowingly or wilfully subscribe to, or make, or cause to be made, any false statement or false entry in any book of such investment company, or exhibit any false paper with the intention of deceiving any person authorized to examine into and pass upon the affairs of such investment company, or who shall make and publish any false statement of the financial condition of such investment company, or who shall make and publish any false statement in relation to the stocks, bonds or other securities by it offered for sale, shall be deemed guilty of a felony and upon conviction thereof shall be fined not less than two hundred dollars nor more than ten thousand dollars, and shall be imprisoned for not less than one year not more than five years in the state penitentiary. Provided, that nothing herein shall in any wise limit or interfere with the civil liability of any person or persons so convicted for any loss occasioned by such criminal act.

"Sec. 13. Any person or persons, agent or agents, who shall sell or attempt to sell, or who shall offer for sale in this state any of the stocks, bonds, debentures or any other securities of any investment company, domestic or foreign, which has not obtained the statement provided for in section five, or the stocks, bonds or other securities of other concerns by it offered for sale, who have not complied with the provisions of this act, or any investment company, domestic or foreign, which shall do any business, or offer or attempt to do any business except filing the statements and reports provided for in section two of this act, which shall not have complied with the provisions of this act, and received from the auditor the statement thereof provided for in section five of this act, or any agent or agents who shall do or attempt to do in this state any business for any investment company, domestic or foreign, which agent is not at the time duly registered and has not fully complied with the provisions of this act, shall be deemed guilty of a misdemeanor, and upon conviction thereof shall be fined for each offense not less than one hundred dollars nor more than one thousand dollars; and shall, in the case of an individual, be imprisoned in the county jail for not less than thirty days nor more than ninety days. Every officer, agent, employé or stockholder of any such investment company who shall violate, or who procures, aids or in any manner abets any violation of this act shall be deemed guilty of either the felony or misdemeanor above provided, as the fact may be, and all shall be guilty as principals and upon conviction shall be punished as hereinbefore provided.

"Sec. 14. All expenses and fees herein provided for shall be collected by the said auditor (save where fees are directed to be paid to some other officer), and shall be accounted for and turned into the state treasury, and the amount of the expenses and fees so turned into the state treasury are

hereby reappropriated to the said auditor for the purpose, and in an amount sufficient to pay the cost and expense of carrying this act into effect; and the said auditor is hereby authorized to appoint an additional clerk, if the same shall be found by him to be actually and absolutely necessary, to carry this act into full force and effect. All money actually and necessarily paid out, or expenses incurred by the said auditor or any clerk under his direction, under this act, shall be paid by the state treasurer out of such sums for expenses and fees received under this act, upon the state auditor's warrants, to be issued upon vouchers containing an itemized account of the salaries or expenses for which the same are issued.

"Sec. 15. All acts and parts of acts in conflict with this act or any provision thereof are hereby repealed."

The Legislatures of at least six other states have enacted so-called "Blue Sky Laws." These states are Arkansas, Kansas, Iowa, Michigan, Oregon, and Florida. So far as we can learn, the Arkansas act has not been passed upon by either the court of last resort of the state or by the United States courts of the state, but a similar statute of the state of Iowa has been passed upon by one Circuit Judge and two District Judges of the Eighth circuit, which includes the state of Arkansas. The same statement is true of the Kansas act; Kansas being in the Eighth circuit. The Iowa act has been declared unconstitutional by the District Court of the United States for the Southern District of the state; Circuit Judge Smith and the two District Judges of the state, McPherson and Pollock, sitting and all three concurring. William R. Compton Co. v. Allen (D. C.) 216 Fed. 537.

The Michigan act has been declared unconstitutional by the United States District Court for the Eastern District of that state; Circuit Judge Denison, of the Sixth circuit, and the two District Judges of the state, Sessions and Tuttle, sitting and all concurring. Alabama & N. O. Transp. Co. v. Doyle (D. C.) 210 Fed. 173.

The constitutionality of the Oregon act, in a case styled National Mercantile Co. v. R. A. Watson et al., 215 Fed. 929, was submitted to the United States District Court of Oregon, Gilbert, Circuit Judge, and Wolverton and Bean, District Judges, sitting, but was not passed upon, the court dismissing the proceeding upon a plea in abatement, denying plaintiff's right to sue, it not having conformed to the provisions of the Oregon law permitting corporations to do business in that state.

The Supreme Court of Florida, in Ex parte C. H. Taylor, 66 South. 292, at its June term, 1914 (not yet officially published), has sustained the so-called "Blue Sky Law" of that state. An analysis of that law shows that it provides by section 1 that every corporation (municipal and others specifically named, excepted) which shall offer for sale within the state of Florida, and outside of the county where it has its principal office or place of business, "through any agency whatsoever," any of its stocks, bonds, debentures, certificates, policies, or other securities of any kind or character, is defined to be a "domestic investment company." "Any corporation organized under the laws of any other state, territory or county shall be known for the purposes of the act as a 'foreign investment company.'"

Section 2 requires both domestic and foreign investment companies, before offering any stocks, bonds, etc., to file with the comptroller with

a $5 filing fee (a) its proposed plan of business, (b) a copy of all contracts, etc., which it proposes to make with or sell to its contractors, (c) its name and location, (d) a financial statement of its affairs, (e) such other information of its affairs required by the comptroller, and (f) verified copies of its charter, constitution, by-laws and other papers pertaining to its organization.

Section 3. Foreign investment companies are also required to file written irrevocable consent that actions against them may be commenced in the proper court of any county in the state where either cause of action arose or plaintiff resides, by service of process upon the Comptroller.

Section 4 makes it the duty of comptroller and Attorney General to examine the statements filed or to make or have made a detailed statement of the corporation's affairs, and, if it is ascertained that it is solvent, that its plan of business is just and equitable, then the comptroller shall issue to it a statement to the effect that it has complied with the act. If the contrary is found, the corporation is to be notified, and it then becomes unlawful for it to sell its securities, etc., until it shall change its constitution, etc., its plan of business, etc., and its financial condition in such manner as to satisfy the comptroller and Attorney General that it is solvent and its plan of business is just and equitable.

Section 5 makes it unlawful for any domestic company or any agent of it to sell its securities in Florida, outside of the county where its principal office or place of business is, until it has complied with the act.

Section 6 provides that an investment corporation may appoint agents, but such agents may not sell the company's securities in Florida (outside the county wherein its principal office is) until such agent has registered with the comptroller and paid the sum of one dollar, and bond may, in the discretion of the comptroller and Attorney General, be required of such agent, etc.

Section 7 provides for statements by the company of its financial condition to be filed and filing fees therefor of five dollars to be paid.

Section 8 provides that when, at any time, it appears that the company's condition is unsound or unsafe or it refuses to file statements, etc., its license, etc., shall be revoked.

Section 9 makes it criminal to subscribe or make false statements or entry in the company's books with design to deceive.

Section 10 makes it criminal for any person or agent to sell the bonds, securities, etc., of any company that has not complied with the act. This section, however, has this significant proviso:

"Provided that nothing in this act shall extend to any seller of stock, bond or other security, who has purchased the same in good faith for value, and who is the bona fide owner of such stock, bond, or other security at time of such sale."

The difference between the scope and extent of this Florida act and that of West Virginia is very apparent in many particulars.

For example:

The Florida act is confined exclusively to corporations, while the West Virginia act includes individuals, copartnerships, and associa-

tions of individuals. The Florida act restricts the corporation from selling in that state (other than in the county wherein is its principal office or place of business) only *its own* stocks, bonds, debentures, certificates, policies, or other securities of any kind or character, while the West Virginia act prohibits sale or attempt to sell *any* stocks, bonds, debentures, or other securities of any kind or character (except those specially mentioned) by any individual, copartnership, corporation, or association.

The Florida act expressly excludes from the effect of its provisions the sale by any bona fide owner of stock, etc., purchased in good faith; the West Virginia act makes no such exception. The Florida act expressly permits its domestic company to sell its stock, etc., in the county in the state wherein it has its principal office or place of business; the West Virginia act permits no such exception. In short, while the provisions of both acts, to some extent, obscure and fail to define clearly their true intent and meaning as to what kind of business operations are sought to be regulated, one might well reach the conclusion that the Florida act had for its purpose the defining of terms and conditions under which corporations can do business in that state and sell its stock and bonds for the purpose of doing such business, a perfectly legitimate thing for the state to do, for its domestic corporations are simply the offsprings of its own creation, while it has long since been determined that as to foreign corporations a state exercising its sovereign power may exclude them from doing business within its territorial limits altogether. But, on the other hand, the West Virginia act must by its terms be construed to regulate individuals, copartnerships, corporations, or associations seeking to engage in the business of buying and selling stocks, bonds, and securities of "any kind or character" other than those expressly exempted. In other words, to prevent any such person, corporation, etc., from selling in the state any obligation of any corporation whether doing business in the state or not, which had not the auditor's permission to do business therein. The sweeping effect of such provision is at once apparent, as it would substantially limit the brokerage business in the state and the purchase by its citizens of standard foreign securities which would have to be sold by them outside the state.

The decision of the Supreme Court of Florida in Ex parte Taylor, supra, is expressly based upon the fact that the power is clear in the Legislature "to limit and regulate the powers and operations of corporations which it brings into existence." And because Taylor, as agent for a domestic corporation, was charged solely with offering to sell in Leon county, another county of the state than the one where the corporation had its principal office or place of business, shares of the capital stock of this domestic corporation within the statutory definition and regulation, the court held that no question of interstate commerce was presented. It further says:

"It is manifestly competent for the lawmaking power to authorize an administrative finding whether the 'proposed place of business and the contracts of a domestic corporation 'contain a fair, just and equitable plan for the transaction of business,' which finding will warrant administrative action duly taken under a statutory police regulation in the interest of the

public welfare, unless restrained or controlled by appropriate judicial action. * * * Such regulations as those prescribed are peculiarly appropriate to corporations as classified in the statute."

We have examined the acts of Arkansas, Kansas, Iowa, and Michigan, the last two of which have been subject to judicial consideration and held to be unconstitutional as hereinbefore set forth. Without entering into detailed analysis of each, it will be sufficient to say that those of Kansas and Arkansas contain substantially the provisions of the West Virginia act. Each seek to make an "investment company" out of any individual, copartnership, corporation, or association seeking to sell any bonds, stock or securities of any kind or character. The Iowa act is made expressly applicable to "investment companies" and also to stockbrokers, defining "investment companies" as including "every corporation or concern, however constituted, now or hereafter organized, which shall sell or cause to be sold or offer for sale, take subscriptions for, or negotiate for the sale of any stocks, bonds, or other securities of any kind or character to any person or persons in the state of Iowa." The Kansas act defines an "investment company" substantially to be as set forth in the West Virginia act, and in its section 10 provides:

"Any investment company or stockbroker failing to file its report as herein provided * * * shall forfeit its right to do business in this state by reason thereof."

The Michigan act is much clearer and more logical than any of the others in that it undertakes to accomplish two things substantially: First, to prevent "every corporation, every copartnership or company and every association" (other than those expressly excepted) from offering for sale the stocks, bonds, etc., of its own issue without permit of the securities commission; second, to prevent any dealer in stocks, etc., from doing so until he has registered and from selling the stocks, etc., of any investment company that has not complied with the act until such dealer shall file such statements and give such information.

It goes without saying, as hornbook law, that it is the duty of the courts to endeavor to carry out the intention and policy of the Legislature, and that therefore they will not declare a statute unconstitutional in whole or in part where it is reasonably susceptible of a construction giving it effect in all its parts. But it is as well settled that courts must confine themselves to the construction of the law as it is, and not attempt to supply defective legislation, or otherwise amend or change the law under the guise of construction. The wisdom or want of wisdom displayed in the act is not a question for the courts, nor are the motives of the Legislature in including or omitting certain provisions. The legislative intention, however, must be the intention, as expressed in the statute itself, and it only must be given effect by the courts, otherwise they would be assuming legislative authority. For courts to violate this rule and assume legislative functions justly merits the severest condemnation. In the interpretation of statutes, words in common use are to be construed in their natural, plain, and ordinary signification. It is a well-settled rule that, so

long as the language used is unambiguous, a departure from its natural meaning is not justified by any consideration of its consequence, or of public policy; and it is the plain duty of the court to give it force and effect. A statute cannot in plain, common, unambiguous words say one thing and be held to mean another thing. Authority for these principles will be found in the hundreds of cases cited in 36 Cyc. 1102 et seq. But, in this connection, while the courts should be, and are, quick and ready to uphold legislative enactments, and where the meanings are doubtful, to solve all such doubts in favor of their validity, they have to recognize a higher and more solemn obligation to uphold and maintain the Constitutions, federal and state, upon which our government rests. These Constitutions emanate from the people themselves and are existent by virtue of their solemn approval. Legislative acts entitled as they are to all presumptions in their favor, originate and become existent by the approval of changing bodies of men, comparatively small in number. Where therefore legislative acts plainly violate the true meaning and effective force of constitutional provisions, courts should be far more prompt and active to prevent pernicious results therefrom, by declaring them invalid, than by specious interpretation, strive to uphold them in spite of such constitutional inhibitions. In the argument of this case it was insisted by defendants' counsel that this act by interpretation should be limited in its application to corporations, and to individuals acting in concert by organization, and not to apply to a single individual conducting his own business.

How can we be expected to place this construction upon it when its first words are:

"Every corporation, every copartnership, every company, every individual and every association (other than state and national banks, surety or guaranty companies, trust companies, and duly authorized insurance companies, real estate mortgage companies, dealing exclusively in real estate mortgage notes, building and loan associations, and corporations not organized for profit), organized or which shall be organized in this state, whether incorporated or unincorporated, which sell or negotiate for the sale of any stocks, bonds, debentures or other securities of any kind or character other than bonds of the United States, or of some county, district or municipality of the state of West Virginia, and notes secured by mortgages on real estate located in the state, to any person or persons in the state of West Virginia, shall be known for the purpose of this act as a domestic investment company," and then, by subsequent sections, proceeds to require such investment company to comply with terms and conditions as set forth under pain of criminal penalties.

If it was intended to apply only to corporations, why did it not stop if its first two words, "every corporation," embraced the full scope of its legislative intent? Why did it add "every copartnership, every company, every individual and every association"? Are we to adopt the conclusion that these words were only used as ejusdem generis with those of "every corporation"? If so, why accentuate the alleged intent by qualifying all with the words "whether incorporated or unincorporated"? How can you have an "unincorporated" corporation? How can you have an "organized" individual? If you say the word "individual" should be judicially construed out of the act and it should

be held applicable only to corporations and to "individuals acting in concert by organization," the objections to it are just as valid as if the word "individual" be allowed to remain for the legal rights, under the federal and state Constitutions, by reason of personal citizenship, attach to every individual just as fully, if he conducts a legitimate and lawful business alone, or by association with other individuals. As we will point out later on, the power of the Legislature to "regulate" the business operations of corporations and those of individuals are vastly different, based upon the fact that individuals, under article 4, § 2, of the federal Constitution, are "citizens" of a state "entitled to all privileges and immunities of citizens in the several states," while corporations are not. So this contention must hark back, at last, to the one that the true intent of the Legislature was that this act should only be made applicable to corporations. It is now substantially admitted that if its intent is to prevent a "citizen" from selling his own notes or other obligations, or bonds, securities, etc., which he may have acquired in the course of business, without a certificate from the auditor of solvency and "sound business capacity," it is clearly subversive of the inalienable right he has to acquire and sell property, and its validity cannot be asserted. As regards this "interpretation" now sought to be obtained from this court in order to save this act from its inherent constitutional defects, two things can very pertinently be noted:

First. The interpretation sought is not the one drawn from it by these state officials themselves, as shown by the facts (without substantial denial) alleged in the bill. These facts, stated briefly, are that Bracey, owning a valuable property, sold it to the Howie corporation, taking its stock in payment. When he offered to sell this stock, his own individual property, to citizens of West Virginia, he and those to whom he has sold are, at the instance of these officials, confronted with criminal proceedings for violation of this act.

Second. It cannot be for a moment questioned that the words of the first section of this West Virginia act, defining those subject to its provisions, are equally if not more particularly minute and inclusive than similar defining words contained in the Iowa and Michigan acts, with which, and others in its provisions, this West Virginia act is largely identical. In the two cases declaring the Iowa and Michigan act to be unconstitutional, all six of the judges sitting have not hesitated to reject the interpretation now sought here and to hold the defining words to include individuals. Says the court in the Iowa case:

"Coming now to a consideration of the act for the purpose of determining whether it does in express terms and undoubted meaning and intent contravene any provision of the organic law of the nation or this state, it is seen to undoubtedly prohibit any person or citizen, natural or corporate, of any foreign state, from selling or offering for sale, in person or through another, in any manner or way whatever, any stocks, bonds, or other securities or obligations, of every kind and nature, to any person within this state, unless the provisions of the act are first complied with, under heavy penalties. That is to say, by its express terms the act prohibits a citizen of a sister state of this country, owning and having stocks, bonds, certificates, or securities, although the same are listed on the exchanges of the country and have a well-established actual and salable value, from either bringing or sending the same into this state for sale unless he first meets the exactions

of this law, or by so doing subjects himself to its penalties. * * * That the act in express terms and by inclusive definitions employed therein does so ordain cannot be gainsaid or denied. That such is the effect and purpose of the act in controversy was not disputed by the able Attorney General of the state on the argument of this cause."

In the Michigan case the court says:

"We take judicial notice of the common understanding that this 'Blue Sky Law' was intended, as is said by the Attorney General, 'to stop the sale of stock in fly-by-night concerns, visionary oil wells, distant gold mines, and other like fraudulent exploitations.' If just this intent had been carried into effect by the act as passed, these cases would not be here; but scrutiny of the law discloses additional and very different effects. It is not confined to corporations, but covers partnerships issuing, and individuals dealing in, securities; it does not relate alone to stocks, but as well to bonds, mortgages, and promissory notes; it is not limited to investment companies, as that term would ordinarily be defined, but extends the definition so that it may include most of the private corporations and partnerships in the United States; it does not cover fraudulent securities merely, but reaches and prohibits the sale of securities that are honest, valid, and safe; it does not simply protect the unwary citizen against fraudulent misleading, but it prevents the experienced investor from deliberately assisting an enterprise which he thinks gives sufficient promise of gain to offset the risk of loss, or which, from motives of pride, sympathy, or charity, he is willing to aid, notwithstanding a probability that his investment will prove unprofitable. Of course, not all of these results follow; but some of them always may, and sometimes will."

And most striking concrete instances of such effects in practical administration are then set forth.·

[3] Recurring to the Florida Case, a careful study of it clearly shows that there is no conflict in principle between its ruling and those of the Michigan and Iowa cases, but, on the contrary, by implication may be held to admit their soundness and integrity. As we have shown, the Florida statute is confined to corporations alone, selling through their agents, their own stocks, etc., in the state, excepting, however, the county thereof wherein is its principal office or place of business, and it expressly excepts from its operation "any seller of stock, bond or other security, who has purchased the same in good faith for value, and who is the bona fide owner of such stock, bond, or other security at the time of such sale." The exercise of this control over the operations of corporations by state Legislatures is perfectly legitimate from the legal point of view, for ever since the decision in Bank v. Earle, 13 Pet. 519, 10 L. Ed. 274, it has been settled that a corporation can have no legal existence outside of the boundaries of the sovereignty by which it was created; that such corporations are not "citizens" within the meaning of article 4, § 2, of the federal Constitution, entitling them "to all privileges and immunities," as such "in the several states"; and the power of the states to determine the terms and conditions under which they, whether domestic or foreign, may do business in the state, has been repeatedly upheld, by the Circuit Court of Appeals for this circuit in Kirven v. Va. Car. Chem. Co., 145 Fed. 288, 76 C. C. A. 172, 7 Ann. Cas. 219; Cumberland Gaslight Co. v. West Va. & Md. Gas Co., 188 Fed. 585, 110 C. C. A. 383.

A state Legislature may therefore prevent foreign corporations from

transacting business altogether within its territorial limits, and it may limit all corporations, foreign and domestic, as to what particular kind of business they may or may not do within the state. So far as they are concerned, it is not a question of police power nor of interstate commerce, but purely and simply the exercise of a well-recognized sovereign power over these artificial bodies. But no such power is vested in any Legislature over either the individual citizen or over the copartnerships or voluntary associations formed or organized by him to do business. He has the equal right with any other citizen to do business in any state, and the states cannot restrict or hamper his right to engage in interstate commerce or his inalienable right to contract, to buy and sell legitimate property.

As regards corporations even, it may truthfully be said that comity between the states, and common sense business considerations, have practically given them unlimited permission to do business throughout the country; but this freedom should certainly not be abused to the extent of allowing them to defraud and cheat, and it may well be the jealous care and concern of the state Legislatures that they do not do so. And in one sense we think this evil has been fully provided for. So far as we know, the states uniformly have criminal statutes against the procurement of money or things of value under misrepresentation, false pretenses, and fraud, and the civil right of the victim of such to recover back the money or property so secured is universally upheld and enforced. In another sense some of the states may have failed to meet their full moral obligation to the citizenship of the whole country, in that they have indiscriminately granted charters to corporations without safeguarding its citizenship and those of sister states from unsound, fraudulent, "wild-cat," and "fly-in-the-night" organizations, forgetting perhaps the homely maxim that an "ounce of prevention is better than a pound of cure." The wisdom of making these provisions in advance, and as part of the conditions upon which the franchise is granted, and by the state granting it, is apparent, for that it cannot be gainsaid that if all the 48 states of the Union attempt to enforce these after-incorporation provisions set forth in these "Blue Sky Laws," with all their fines, penalties, and fee exactions, against all legitimate and sound business corporations, because some states have recklessly chartered others that were unsound and conceived to cheat and defraud, business conditions throughout the country will be greatly affected and injured.

[2] We do not think it can be longer questioned that stocks, bonds, debentures, and other securities are subject-matters of interstate commerce. Gibbons v. Ogden, 9 Wheat. 1, 6 L. Ed. 23; Brown v. Maryland, 12 Wheat. 419, 6 L. Ed. 678; Chy Lung v. Freeman, 92 U. S. 275, 23 L. Ed. 550; Railroad Co. v. Husen, 95 U. S. 465, 24 L. Ed. 527; Telegraph Co. v. Telegraph Co., 96 U. S. 1, 24 L. Ed. 708; Telegraph Co. v. Pendleton, 122 U. S. 347, 7 Sup. Ct. 1126, 30 L. Ed. 1187; Lottery Cases, 188 U. S. 321, 23 Sup. Ct. 321, 47 L. Ed. 492; Book Co. v. Pigg, 217 U. S. 91, 30 Sup. Ct. 481, 54 L. Ed. 678, 27 L. R. A. (N. S.) 493, 18 Ann. Cas. 1103; West v. Kansas Co., 221 U. S. 229, 31 Sup. Ct. 564, 55 L. Ed. 716, 35 L. R. A. (N. S.) 1193;

Cook'on Corp. (7th Ed.) vol. 2, § 486, p. 1364; A. & N. O. Trans. Co. v. Doyle (D. C.) 210 Fed. 173; Compton v. Allen (D. C.) 216 Fed. 537.

It follows that we must reject the contention that this act can be interpreted to affect only corporations, and not individuals. On the contrary, we are driven to the conclusion that it distinctly seeks to abridge and deny the rights of citizens of the United States to buy and sell property in the state, thus depriving them of their property without due process of law; that it denies them the equal protection of the laws; and that it imposes a restraint and burden on interstate commerce contrary to the provisions of the Constitution of the United States. We do not deem it necessary to extend further discussion in support of this conclusion. The opinions in the Iowa and Michigan cases are so clear, sound, and convincing as to not only command our admiration, but lead us to the conclusion that nothing more complete and effective can be added to them.

The temporary injunction prayed for must be awarded.

WOODS, Circuit Judge (dissenting). The question to be decided under this application for a temporary injunction is whether the enforcement of the statute of West Virginia approved February 11, 1913, known as the "Blue Sky Law," will violate the rights of the plaintiffs under the Constitution of the United States. The plaintiff Howie Mining Company is an Arizona corporation with an authorized capital in preferred stock of 300,000 shares and common stock of 1,700,000 shares, all of the par value of one dollar each. Its property consists of mining property in North Carolina alleged to be of great value, conveyed to the company by Smith H. Bracey in consideration of the issue to him of all the stock both common and preferred, except four shares. The plaintiff Bracey sold some of his holdings to the other individual plaintiffs, with an undertaking on the part of Bracey and his wife to take the stock back at an advance of 10 per cent., if so requested at the end of a year. Bracey and these purchasers from him having offered stock of the company for sale in West Virginia, prosecutions were commenced and others threatened against them under the statute making a criminal offense the offering for sale of such stock without having filed a statement of its affairs with the State Auditor as required by the statute, and without having obtained from him the certificate provided for by section 5 of the act, to the effect that the company is solvent, that its articles of incorporation or association, its constitution and by-laws, its proposed plan of business, and proposed contract or securities contain and provide for a fair, just, and equitable plan for the transaction of business, and in his judgment promises a fair return on the stocks, bonds, debentures, and other securities by it offered for sale.

Thereupon this action was brought to enjoin the prosecution on the ground that the statute is unconstitutional for these reasons:

(1) By its enforcement the plaintiffs and others in like situation will be deprived of liberty and property without due process of law.

(2) The attempt is made to confer on the auditor legislative power.

(3) The attempt is made to confer on the auditor both legislative and judicial powers in violation of the Constitution of West Virginia.

(4) It denies to the plaintiffs and other citizens the equal protection of the laws.

(5) It materially and directly burdens interstate commerce.

The force of these objections depends chiefly on the construction of the statute. If it means that no corporation, copartnership, or individual, a citizen of West Virginia or other state, can give his or its note or other obligation or sell any security he or it may have acquired in the course of business, without a certificate of solvency, of fair transaction of business, and promise of a fair return on the paper, it would be so obviously subversive of the right to acquire and sell property that its validity would hardly be asserted in any court. Indeed, nothing but language which admitted of no other construction should induce a court to impute to the Legislature the intention to do a thing so arbitrary and unreasonable. When the language of this statute is considered in view of the evil which the Legislature intended to prevent, I think the objections to it will fail. The principle that courts must reject construction of a statute, which would make it inconsistent with the Constitution if consistency with the Constitution can be found in any other reasonable construction, applies with especial force in the consideration of statutes which are intended to protect the public from prevalent frauds or to remedy evil conditions affecting the public. Courts must also recognize in such an issue the civic aspiration of enlightened people of our land, as it is expressed in legislative action by providing laws which will protect the community by holding back the evil-minded from crime, rather than by mere provision for punishment after its commission. The laudable desire and effort to this end has resulted in the enactment of many laws which seem to be novel in their scope. But novelty does not argue unconstitutionality. The power of the courts to declare such statutes invalid should be exercised with great caution, and the presumption is always in favor of the validity of the regulations they prescribe. They should not be declared void unless they clearly go beyond the evil to be remedied and so constitute a clear invasion of the rights of the citizen. What business is effected with a public interest, and therefore the proper subject of police regulation, is primarily a matter for legislative determination. Giozza v Tiernan, 148 U. S. 657, 13 Sup. Ct. 721, 37 L. Ed. 599; Rippey v. Texas, 193 U. S. 504, 24 Sup. Ct. 516, 48 L. Ed. 767.

The statute here involved was intended to prevent, or at least check, one of the most generally recognized and harmful evils of economic life. With increasing facilities of communication all sorts of fraudulent and visionary schemes are imposed on the public by selling stocks, bonds, and other papers, in form of securities, calling for returns on the investment. Nothing seems plainer than the right of the Legislature under the police power to provide by statute a reasonable method of having these schemes examined into by some public authority and requiring those who would sell to the public securities based on them to make a showing of good faith, solvency, and a reasonable chance

of return on the investment. This I think is all that the Legislature of West Virginia has undertaken to do. The validity of similar legislation has been so often sustained that citation of authority seems hardly necessary. On the same principle rests the regulation of railroads by commissions, the inspection of meat, the condemnation of impure food, examination and inspection of cattle and fertilizers, examination and regulation of insurance companies and their contracts, the inspection and regulation of markets and mines, and the regulation of the business of labor agents, and of certain classes of banks. The police power of a state extends to all regulations of its internal commerce designed to promote the public convenience or to prevent imposition or fraud, as well as those designed to promote public health, public morals, or public safety; and this, too, though the regulations described may incidentally affect interstate commerce provided Congress has not acted in the particular matter. Savage v. Jones, State Chemist of State of Indiana, 225 U. S. 501, 32 Sup. Ct. 715, 56 L. Ed. 1182; Lemieux v. Young, Trustee, 211 U. S. 489, 29 Sup. Ct. 174, 53 L. Ed. 295; Booth v. Illinois, 184 U. S. 425, 22 Sup. Ct. 425, 46 L. Ed. 623; Chicago, etc., Ry. Co. v. Drainage Commissioners, 200 U. S. 562, 26 Sup. Ct. 341, 50 L. Ed. 596, 4 Ann. Cas. 1175; Wilmington Star Mining Co. v. Fulton, 205 U. S. 60, 27 Sup. Ct. 412, 51 L. Ed. 708; Bacon v. Walker, 204 U. S. 311, 27 Sup. Ct. 289, 51 L. Ed. 499; Williams v. Fears, 179 U. S. 270, 21 Sup. Ct. 128, 45 L. Ed. 186; Broadnax v. State of Missouri, 219 U. S. 285, 31 Sup. Ct. 238, 55 L. Ed. 219; Natal v. Louisiana, 139 U. S. 621, 11 Sup. Ct. 636, 35 L. Ed. 288; Slaughter House Cases, 16 Wall. 36, 21 L. Ed. 394; Assaria State Bank v. Dolley, 219 U. S. 121, 31 Sup. Ct. 189, 55 L. Ed. 123; Savage v. Jones, 225 U. S. 501, 32 Sup. Ct. 715, 56 L. Ed. 1182; Simpson v. Kennedy, 230 U. S. 352, 33 Sup. Ct. 729, 57 L. Ed. 1511, 48 L. R. A. (N. S.) 1151. In Patapsco Guano Co. v. North Carolina, 171 U. S. 345, 18 Sup. Ct. 862, 43 L. Ed. 191, the court says:

"Where the subject is of wide importance to the community, the consequences of fraudulent practices generally injurious, and the suppression of such frauds matter of public concern, it is within the protective power of the state to intervene."

The statute is to be analyzed and tested by these principles.
The first section provides:

"Every corporation, every copartnership, every company, every individual and every association * * * organized in this state, whether incorporated or unincorporated, which sell or negotiate for the sale of any stocks, bonds, debentures or other securities of any kind or character other than the bonds of the United States; or of some county, district or municipality of the state of West Virginia, and notes secured by mortgage on real estate located in this state. * * * shall be known for the purpose of this act as a domestic investment company. Every such investment company organized in any other state * * * shall be known for the purpose of this act, as foreign investment company."

Section 2 requires that before offering or attempting to sell any stocks, bonds, debentures, or other securities of any kind or character, other than those specifically exempted in section 1 of this act, to

any person or persons, or transacting any business in this state, the investment company shall file a statement of its condition and affairs with the auditor of the state.

Section 5 provides:

"It shall be the duty of the auditor to examine the statement and documents so filed, and if said auditor shall deem it advisable he shall have made a detailed examination of such investment company's affairs, which examination shall be made under the supervision of said auditor, and such examination shall be at the expense of such investment company, as hereinafter provided. And if the said auditor, upon his investigation, finds that such investment company is solvent, that its articles of incorporation or association, its constitution and by-laws, its proposed plan of business and proposed contract or securities contain and provide for a fair, just and equitable plan for the transaction of business, and in his judgment promises a fair return on the stocks, bonds, debentures and other securities by it offered for sale, said auditor shall issue to such investment company a statement reciting that such company has complied with the provisions of this act; that detailed information in regard to the company and its securities is on file in the auditor's office for public inspection and information; that such investment company is permitted to do business in this state; and such statement shall also recite in bold type that such auditor in no wise recommends the securities to be offered for sale by such investment or security company."

It is then provided that if the auditor shall make an adverse finding on the matters of solvency, fairness, or the plan of business and the promise of a fair return on the stocks, etc., it shall be unlawful for the investment company to do business in the state until it makes such changes as shall satisfy the auditor that it meets the requirement of the law. The act then provides a penalty against—

"any person or persons, agent or agents, who shall sell or attempt to sell, or who shall offer for sale in this state any of the stocks, bonds, debentures or any other securities of any investment company, domestic or foreign, which has not obtained the statement provided for in section five, or the stocks, bonds or other securities of other concerns by it offered for sale, who have not complied with the provisions of this act, or any investment company, domestic or foreign, which shall do any business, or offer or attempt to do any business," without complying with its requirements.

In the first place, it seems quite clear that the statute is limited in its application to corporations, and to individuals acting in concert by organization—that is, by making a whole of interdependent parts— and was not intended to apply to a single individual conducting his own business. This is apparent from the use of the limiting adjective "organized," used in the first section of the act. Neither the absurdity of calling a single individual a company, nor the impossible thing of legislating against his doing acts when "organized," could have been intended. Not only do the words of the first section exclude the individual, but the text of the entire statute indicates an intention to apply and limit the legislation to business organizations or combinations of a number of persons. By sections 3 and 5 the application of the law is clearly limited to those who are associated together under some sort of articles or agreement of association. It is true that the first section of the statute in designating those to be subject to its provisions uses the singular "individual"; but under the well-known rule the court should hold the plural to have been intended when that construction is required by the context as in this instance, and especial-

ly where it will aid in sustaining the validity of the statute. People v. Aurora, 84 Ill. 157; Ellis v. Whitlock, 10 Mo. 781.

It is next to be observed that the statute does not restrict the borrowing of money or even relate to the borrowing or lending of money, but regulates, for the protection of the public, the business of those organized combinations of individuals "which sell or negotiate for the sale of any stocks, bonds, debentures, or other securities." It is vital to consider that this language cannot be construed to fetter a corporation, or partnership, or other association of individuals engaged in other business by forbidding it to sell a security acquired in the regular course of such other business; on the contrary, by its meaning appearing from the context, it limits the organizations or combinations to which it applies to those which sell or negotiate securities as the whole or a constituent part of their business either as a temporary measure or as a permanent enterprise. Thus construed, the statute meets a very important public purpose, without undue restraint of personal liberty. Frauds or impositions in the sale of securities are not usually effected by sale to the public of the obligation of a single individual. Usually an organization is effected of two or more persons under an organization name to give the appearance of greater responsibility and to make such responsibility more illusory. When the whole or a constituent part of the business either as a temporary measure or a permanent enterprise is to raise money by the sale of the securities of such an organization to the public—that is, to any one who will buy, I am unable to find any ground for holding that the state may not in the exercise of its police power provide for such examination into the business of the organization as is reasonably necessary to protect its citizens against imposition. The case on this point comes distinctly within the scope of the police power as defined and illustrated in the decisions of the Supreme Court of the United States above cited.

It is argued, however, that the powers conferred on the auditor are so broad and vague as to be arbitrary, in that they require him to refuse a license or certificate unless he finds that the investment company (1) is solvent, (2) that its plan of business and proposed contracts or securities contain and provide for a fair, just, and equitable plan for the transaction of business, and (3) in his judgment promises a fair return on the securities by it offered for sale. Received standards of solvency, of fairness, of the prospect of fair returns on investment are sufficiently definite for a conclusion to be reached with reasonable certainty, after investigation, that a business enterprise falls above or below them; and therefore reaching such a conclusion after investigation does not denote the exercise of arbitrary power. Certainly no objection can be made to the ascertainment of solvency, for that is now intrusted by law, without objection, to public officials in the examination of banks and other institutions. It is true that no exact standard of what is a fair plan of business and what is a promise or prospect of a fair return on a bond or other security can be laid down with accuracy. But in many ways the affairs of men depend on the ascertainment by public authority of fair valuation, fair sale, fair value, fair return on investment. Such ascertainment is re-

quired in passing on rates and management of railroads and other public service corporations by commissions; in deciding on the sufficiency of sanitation and fire protection, and on the fitness of men to practice medicine and other professions; and in passing on many other matters in which the public has a special concern. Indeed, the necessity and legality of intrusting to men the power and duty to ascertain and determine what is reasonable or fair between citizens or between the citizen and the public enters of necessity into the whole fabric of the law, not only in its judicial, but in its executive and legislative department.

The distinction between this power to determine the fairness or reasonableness of a matter or the fitness of a person which may be conferred, and mere arbitrary power which cannot be conferred, is set out and illustrated in Yick Wo v. Hopkins, Sheriff, 118 U. S. 356, 6 Sup. Ct. 1064, 30 L. Ed. 220, and numerous other cases.

In Gundling v. Chicago, 177 U. S. 183, 20 Sup. Ct. 633, 44 L. Ed. 725, the court says:

"Regulations respecting the pursuit of a lawful trade or business are of very frequent occurrence in the various cities of the country, and what such regulations shall be and to what particular trade, business, or occupation they shall apply, are questions for the state to determine, and their determination comes within the proper exercise of the police power by the state, and unless the regulations are so utterly unreasonable and extravagant in their nature and purpose that the property and personal rights of the citizen are unnecessarily, and in a manner wholly arbitrary, interfered with, or destroyed without due process of law, they do not extend beyond the power of the state to pass, and they form no subject for Federal interference."

It is no objection to the discretionary power conferred on the auditor that he may exercise it arbitrarily; for the presumption is that he will not, and the citizen is protected from arbitrary action by the judicial power. Chicago v. Wellman, 143 U. S. 339, 12 Sup. Ct. 400, 36 L. Ed. 176.

Discussion of the position that the statute undertakes to confer on the auditor legislative and judicial power is unnecessary, since the point was recently decided against the contention of the plaintiff in Manufacturers' Light & Heat Co. et al. v. Lee Ott et al., Public Service Commission of West Virginia (D. C.) 215 Fed. 940, on the authority of Interstate Commerce Commission v. Goodrich Transit Co., 224 U. S. 194, 32 Sup. Ct. 436, 56 L. Ed. 729.

The statute only indirectly affects interstate commerce in the correction of an evil upon which Congress has not legislated. It relates to commercial transactions within the state, and places the citizens of other states on an equal footing with the citizens of West Virginia. It is not therefore a regulation of interstate commerce within the exclusive power of Congress. Minnesota Rate Case, 230 U. S. 352, 33 Sup. Ct. 729, 57 L. Ed. 1511, 48 L. R. A. (N. S.) 1151; Brimmer v. Rebman, 130 U. S. 78, 11 Sup. Ct. 213, 35 L. Ed. 862.

The plaintiffs have no ground to complain that the statute exempts state and national banks, surety or guaranty companies, trust companies, duly authorized insurance companies, real estate mortgage companies, dealing exclusively in real estate mortgage notes, building and

loan associations, and corporations not organized for profit. The classification was not arbitrary and was within the power of the Legislature. Engel v. O'Malley, 219 U. S. 128, 31 Sup. Ct. 190, 55 L. Ed. 128; Broadnax v. State of Missouri, 219 U. S. 285, 31 Sup. Ct. 238, 55 L. Ed. 219.

In Compton v. Allen, Circuit Judge Smith and District Judges McPherson and Pollock decided on July 6, 1914, a statute of Iowa, similar in terms to be unconstitutional; and the same result was reached in Alabama & N. O. T. Co. et al. v. Doyle (D. C.) 210 Fed. 173, as to a statute of the state of Michigan. The statutes as construed in these opinions are more restrictive of the sale of securities than we find the West Virginia statutes to be. On the other hand, the Supreme Court of Florida, in Ex parte Taylor, decided June, 1914, has held a similar statute constitutional. No case has been found which passes upon a statute precisely like that here involved. Section 4 of the act must be declared unconstitutional, in that it imposes a burden on the individual citizens of other states not imposed on citizens of West Virginia by requiring them to file an irrevocable consent that an action may be commenced against them by service of process on the state auditor. This deprives the citizens of the state of West Virginia and denies to them the equal protection of the laws. Guy v. Baltimore, 100 U. S. 434, 25 L. Ed. 743. But the elimination of this section does not materially affect the remainder of the statute and does not destroy the validity of its other provisions.

In my opinion the statute should be held constitutional and the injunction refused. If the plaintiffs do not fall within the terms of the statute, the fact may be proved in their defense to the indictment; but it is not available in an action to enjoin the enforcement of the statute as a nullity. Fitts v. McGhee, 172 U. S. 516, 19 Sup. Ct. 269, 43 L. Ed. 535; Davis & Farnum Mfg. Co. v. Los Angeles, 189 U. S. 207, 23 Sup. Ct. 498, 47 L. Ed. 778.