GEIGER-JONES CO. v. TURNER, Atty. Gen. of State of Ohio, et al.
COULTRAP v. SAME.  ROSE et al. v. HALL, Superintendent of
Banks and Banking of State of Ohio, et al.

(District Court, S. D. Ohio, E. D.  February 10, 1916.)

Nos. 51-53.

1. CONSTITUTIONAL LAW ⬥48—PRESUMPTION AS TO VALIDITY OF STATUTE.
    A statute must be sustained, unless it can be clearly shown to be in
    conflict with some constitutional provision.
    [Ed. Note.—For other cases, see Constitutional Law, Cent. Dig. § 46;
    Dec. Dig. ⬥48; Statutes, Cent. Dig. § 56.]

2. CONSTITUTIONAL LAW ⬥38—VALIDITY—SCOPE OF INQUIRY.
    If under the federal Constitution a state had no power to enact a stat-
    ute, it is unimportant how wise, necessary, or beneficent the statute may
    be, as it is necessarily void because in conflict with the organic law of
    the land.
    [Ed. Note.—For other cases, see Constitutional Law, Cent. Dig. § 36;
    Dec. Dig. ⬥38.]

3. STATUTES ⬥64—PARTIAL INVALIDITY—EFFECT.
    If there are separate and independent unconstitutional provisions in a
    statute, which may be rejected, and the rest of the act permitted to stand
    and have effect according to the legislative intent, the valid portion must
    be upheld; but if an unconstitutional element pervades the entire statute
    as an inherent and essential part, it must fail as an entirety.
    [Ed. Note.—For other cases, see Statutes, Cent. Dig. §§ 58-66, 195;
    Dec. Dig. ⬥64.]

4. STATUTES ⬥64—VALIDITY—ENFORCEMENT IN CONSTITUTIONAL MANNER.
    That the officer charged with the execution of a law which authorizes
    the accomplishing of an unconstitutional purpose may not enforce it ac-
    cording to its terms, but only as he may deem wise and expedient, can-
    not save the statute, as it will not be presumed that the statute will only
    be used to accomplish what can be done in accordance with the Consti-
    tution.
    [Ed. Note.—For other cases, see Statutes, Cent. Dig. §§ 58-66, 195;
    Dec. Dig. ⬥64.]

5. COMMERCE ⬥12—INTERSTATE COMMERCE—VALIDITY OF STATE LAWS.
    A state law which in its essentials is a legitimate exercise of the police
    power, is not rendered invalid by the fact that interstate commerce is
    thereby incidentally affected; but if such law directly burdens such
    commerce it is unconstitutional, though expressed to be a regulation
    under the state police powers.
    [Ed. Note.—For other cases, see Commerce, Cent. Dig. §§ 7, 9; Dec.
    Dig. ⬥12.]

6. COMMERCE ⬥15, 40—INTERSTATE COMMERCE—SUBJECTS OF INTERSTATE
    COMMERCE.
    Stocks and bonds are articles of legitimate interstate commerce, and
    sales of them as between the states, and their transmission from one
    state to another by mail or by common carrier constitute interstate com-
    merce.
    [Ed. Note.—For other cases, see Commerce, Cent. Dig. §§ 17, 29, 30,
    34, 35; Dec. Dig. ⬥15, 40.]

7. COMMERCE ⬥57—STATUTES ⬥64—INTERSTATE COMMERCE—VALIDITY OF
    STATE LAWS.
    The Ohio "blue-sky" law (Gen. Code, §§ 6373-1 to 6373-24, amended by
    Act May 6, 1913 [103 Ohio Laws, p. 743]) requires dealers in stocks, bonds,
    and other securities to obtain a license from the superintendent of banks,

⬥For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

and make application, giving certain information concerning the applicant, the location and character of its business, and references, establishing the good repute of the applicant's directors, officers and agents. If the applicant be a foreign corporation, it must also file a copy of its articles of incorporation, etc. Notice of the application must be published. A licensed dealer may not sell securities until it has also filed a statement· concerning the issuer of the securities, etc. An issuer or underwriter is prohibited from disposing of securities, to organize any company, or assisting in the flotation of its securities, without furnishing similar information and procuring a certificate. The commissioner may revoke licenses or certificates, and, though his action is reviewable, the review is restricted to the court of a particular county. *Held*, that this imposes direct and substantial burdens on interstate commerce, and its unconstitutional features are so distributed through its various parts as to be inseparable and vitiate the entire act.

[Ed. Note.—For other cases, see Commerce, Cent. Dig. §§ 72–76, 88, 90, 92–102; Dec. Dig. ☞57; Statutes, Cent. Dig. §§ 58–66, 165; Dec. Dig. ☞64.]

8. CONSTITUTIONAL LAW ☞296—DUE PROCESS OF LAW—DENIAL.

The Ohio "blue-sky" law, regulating the sale of bonds, stocks, and other securities, deprives dealers in stocks, bonds, and other securities to which it relates of their property and of their liberty or right to pursue a lawful calling without due process of law, limited only by the unrestrained discretion of the commissioner appointed under the act, and every investigation is ex parte, no rules of procedure are prescribed, nor is the commissioner required to establish any rule or regulation. He may hear only evidence unfavorable to the investigated party and without the safeguard of an oath, and the uncontrolled discretion of the commissioner or his assistant may injure and possibly destroy worthy business enterprises and cast a cloud on the name of the applicant or licensee.

[Ed. Note.—For other cases, see Constitutional Law, Cent. Dig. §§ 825–838, 840–846; Dec. Dig. ☞296.]

9. CONSTITUTIONAL LAW ☞212—EQUAL PROTECTION OF THE LAWS—POLICE REGULATIONS.

A police regulation, like any other law, is subject to the equal protection clause of Const. U. S. Amend. 14.

[Ed. Note.—For other cases, see Constitutional Law, Cent. Dig. §§ 684, 705; Dec. Dig. ☞212.]

10. CONSTITUTIONAL LAW ☞211—EQUAL PROTECTION OF THE LAWS.

A statute does not deny the equal protection of the laws, if all persons brought under its influence are treated alike under the same conditions, and if it does not subject the individual to an arbitrary exercise of the powers of government.

[Ed. Note.—For other cases, see Constitutional Law, Cent. Dig. § 678; Dec. Dig. ☞211.]

11. CONSTITUTIONAL LAW ☞240—EQUAL PROTECTION OF THE LAWS.

The Ohio "blue-sky" law excepts from its provisions corporate bonds where more than 50 per cent. of the entire issue is included in a sale to one purchaser, and sales by an owner, not the issuer of a security, who disposes of his own property for his own account, when such disposal is not made in the course of repeated transactions of a similar character, and sales by a natural person, other than the underwriter of a security, who is a bona fide owner of the security and disposes of his own property for his own account. It requires licensed dealers, before disposing of any securities, to furnish information concerning the issuer of the security and its business, but provides that this information need not be filed if actual current sales of the securities at prices quoted shall have

---

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

been, for not less than six months, published in the regular market reports of a daily newspaper of general circulation in the state, or where there is a disposal of securities the price for which in a single transaction by one disposee shall amount to $5,000 or more, or where the disposal is made for a commission of less than 1 per centum of the par value by a licensee who is a member of a regularly organized Stock Exchange, and who has an established place of business in the state, regularly open for public patronage. *Held* that, in view of these exceptions, the statute denies the equal protection of the laws, in violation of Const. U. S. Amend. 14.

[Ed. Note.—For other cases, see Constitutional Law, Cent. Dig. §§ 688, 692, 693, 697–699; Dec. Dig. ☞240.]

12. CORPORATIONS ☞39—STATUTORY PROVISIONS—AMENDMENT OR ALTERATION.

Const. Ohio art. 13, § 2, as amended September 3, 1912, providing that corporations may be classified, and that there may be conferred upon proper boards, commissioners, or officers such supervisory and regulatory powers over their organization, business, and issue and sale of stocks and securities, and over the business and sale of the stocks and securities of foreign corporations and joint-stock companies in the state as may be prescribed by law, vests in the Legislature no greater power than it possessed under the old section, which provided that laws under which corporations were formed might from time to time be altered or repealed, and does not authorize the Legislature to so burden the business of domestic corporations as in practical effect to destroy it, as is done by the "blue-sky" law.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 119, 121–123; Dec. Dig. ☞39.]

13. STATUTES ☞64—PARTIAL INVALIDITY—EFFECT.

It cannot be presumed that the Legislature would have enacted the Ohio "blue-sky" law, if it had understood that its provisions could not be sustained as against foreign corporations, since this would work an obvious discrimination against domestic corporations.

[Ed. Note.—For other cases, see Statutes, Cent. Dig. §§ 58–66, 195; Dec. Dig. ☞64.]

In Equity. Three suits, by the Geiger-Jones Company and by Don C. Coultrap, against Edward C. Turner, Attorney General of the State of Ohio, and another, and by William R. Rose and another, against Henry T. Hall, Superintendent of Banks and Banking of the State of Ohio, and others. On application in each case for a temporary injunction. Temporary injunction granted.

E. N. Huggins, Timothy Hogan, and J. A. Shauck, all of Columbus, Ohio, M. B. & H. H. Johnson and Francis R. Marvin, all of Cleveland, Ohio, and A. M. McCarty, of Canton, Ohio, for plaintiffs.

Edward C. Turner, Atty. Gen., and Henry S. Ballard, First Asst. Atty. Gen., of Columbus, Ohio, for defendants.

Before WARRINGTON, Circuit Judge, and SATER and HOLLISTER, District Judges.

SATER, District Judge. The constitutionality of the so-called "blue-sky" law of Ohio (sections 6373–1 to 6373–24, General Code, as amended by 103 Ohio L. pp. 743–753, 104 Ohio L. pp. 110–119, 105–106 Ohio L. pp. 363–364) is assailed in each of the above-mentioned

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

cases, which, for convenience, are considered together. Statutes of a kindred character have in learned opinions been declared invalid by federal courts sitting in Michigan (Alabama & N. O. Transp. Co. v. Doyle [D. C.] 210 Fed. 173, Halsey & Co. v. Merrick, 228 Fed. 805), Iowa (Compton v. Allen [D. C.] 216 Fed. 537), West Virginia (Bracey v. Darst [D. C.] 218 Fed. 482), and South Dakota (Sioux Falls Stockyards Co. v. Caldwell). The last-named case, which is unreported, was decided by Sanborn, Circuit Judge, and Munger and Elliott, District Judges.* Although a consideration of the act will involve a reiteration of principles already ably and convincingly stated, it is thought advisable to review it in part, at least—a task rendered difficult on account of the numerous exceptions to its general provisions, and, in some instances, of exceptions to such exceptions.

The Geiger-Jones Company, an Ohio corporation, is engaged in buying and selling in Ohio and other states stocks and bonds principally of industrial corporations, domestic and foreign. It seeks to prevent the revocation of the license heretofore granted it to transact such business and the threatened enforcement of the law against its continued prosecution of the same. Coultrap, a citizen of the state of Pennsyl-

---

*In Sioux Falls Stockyards Co. et al. v. Caldwell no opinion was filed by the court, but a decree was entered reading as follows:

"On this 18th day of November, A. D. 1915, the case above entitled came on for hearing upon the order to show cause why an interlocutory injunction herein should not issue.

"Mr. George J. Danforth appeared and argued the matter for the plaintiffs, and Mr. C. C. Caldwell, Attorney General of the state of South Dakota, appeared and argued the questions in controversy for the defendants.

"And now, after consideration of the pleadings and the arguments, because, in the opinion of the court, chapter 275 of the Session Laws of the State of South Dakota for the year 1915, is violative of the Constitution of the United States, and this opinion is confirmed by the decisions in Alabama & N. O. Transportation Co. v. Doyle (D. C.) 210 Fed. 173, Wm. R. Compton Co. v. Allen et al. (D. C.) 216 Fed. 537, and Bracey v. Darst (D. C.) 218 Fed. 482:

"It is hereby ordered, that the defendants Clarence C. Caldwell, as Attorney General of the state of South Dakota, Harry O'Brien, as insurance commissioner of the state of South Dakota, and ex officio member of the state securities commission of that state, Joseph L. Wingfield, as public examiner of the state of South Dakota, and ex officio member of the state securities commission, and Dan E. Hanson, as state's attorney of Turner county, South Dakota, and each of them individually, and each and all of their agents, servants, and assistants, and all others to whom knowledge of this order may come, be and they are hereby enjoined from instituting and prosecuting any actions, civil or criminal, against the complainants under the aforesaid act of the Legislature of the state of South Dakota, for alleged violations thereof and from taking any proceedings for the enforcement of said act, against the complainants, except such proceedings as may be deemed proper by them in the criminal actions already pending against the complainants.

"This injunction shall take effect upon the filing of a bond, approved by the judge of the United States District Court for the District of South Dakota, to the United States, in the sum of three thousand dollars ($3,000.00), conditioned upon the payment of such costs and damages as may be incurred or suffered by any party who may be found to have been wrongfully enjoined or restrained thereby; such bond to contain a clause providing that any damages sustained thereunder are to be ascertained as the court shall direct.

"And this injunction shall continue until the final decision of this case, or the further order of the court."

vania and an agent of the Geiger-Jones Company, is also the owner and holder of and a dealer in stocks of certain Ohio corporations, and conducts his business in part by mail and in part by personal visits to the state. He charges that the revocation of the license of his employer will operate as a cancellation of his authority, and that the contemplated enforcement of the statute will interrupt and destroy his business.

Rose was heretofore arrested, indicted, and convicted in one of the state courts for violating the act by selling the stocks and bonds of industrial concerns, and, particularly, the stock of his coplaintiff, a West Virginia corporation, and is now awaiting sentence. Both he and the RiChard Auto Manufacturing Company allege that the enforcement of the statute by the defendants named in their bill will prevent Rose from prosecuting his business of selling securities and his coplaintiff from completing its organization and capitalization for the manufacture of automobiles.

Briefly stated, the validity of the act is assailed on the grounds that (1) it is violative of the commerce clause of the federal Constitution; (2) it is constitutionally obnoxious, in that it deprives plaintiffs of property without due process of law and denies them the equal protection of the laws; (3) it delegates legislative and judicial power to an executive officer, in violation of the state Constitution; and (4) it is a law of a general nature, but does not operate uniformly throughout the state, as required by section 26, article 2, of the state Constitution. If the act be unconstitutional, each of the plaintiffs is, as he must be, within the class whose constitutional rights are invaded. Standard Stock Food Co. v. Wright, 224 U. S. 540, 550, 32 Sup. Ct. 784, 56 L. Ed. 1197. The prayer of each bill is for general as well as specific relief.

The act, which is entitled "An act to regulate the sale of bonds, stocks, and other securities, and of real estate not located in Ohio, and to prevent fraud in such sales," prohibits, under severe penalties, the disposition of all securities subject to its provisions, without discrimination as to and regardless of their value, unless authority so to do is first obtained from the superintendent of banks (termed the commissioner). The term "dispose of" is broadly construed to mean "sell, barter, pledge, or assign for a valuable consideration or obtain subscriptions for." The first section, 6373–1, in comprehensive language declares that, except as otherwise provided in the act, no dealer may within the state dispose of or offer to dispose of any stocks, stock certificates, bonds, debentures, collateral trust certificates or other similar instruments (all termed "securities") evidencing title to or interest in property issued or executed by any private or quasi public corporation, copartnership or association (except corporations not for profit), or by any taxing subdivision of any other state, territory, province or foreign government, without being first licensed so to do. Promissory notes are not within the terms of the act, as was the case in the original Michigan statute. A limited number of other securities are also excluded from its provisions. The inclusive character of the act extends, not only to "securities" coming within its provisions, but also to the persons subject to its exactions, prohibitions and penalties, as is

evidenced by its definition of the terms "dealer" and "company," the former embracing "any person or company" and the latter "any corporation, copartnership or association, incorporated or unincorporated, whenever and wherever organized." The term "dealer" does not, however, include national banks or any company engaged in the marketing or flotation of it own securities or any stock-promoting scheme, although such company and scheme are required. to obtain the certificate of the commissioner mentioned, and must abide by all the provisions contained in sections 6373–14 and 6373–16. A restricted number of other persons, natural and artificial, having occasion to dispose of securities, are also excluded from the classification of dealers. An "issuer" is defined to be an original issuer.

[1, 2] The act must be sustained unless it can be clearly shown to be in conflict with some constitutional provision. The question as to its wisdom was for the determination of the Legislature; with that the court is not concerned. If the power under the federal Constitution to enact it is absent, it is unimportant how wise, necessary or beneficent it may be, for it is then necessarily void because in conflict with the organic law of the land. Rail & River Coal Co. v. Yaple (D. C.) 214 Fed. 273, 279, 280; Alabama & N. O. Transp. Co. v. Doyle (D. C.) 210 Fed. 176; Bracey v. Darst (D. C.) 218 Fed. 491, 492; Board of Health v. Greenville, 86 Ohio St. 1, 20, 98 N. E. 1019, Ann. Cas. 1913D, 52; State v. Toledo, 48 Ohio St. 112, 132, 133, 26 N. E. 1061, 11 L. R. A. 729.

[3, 4] If there are separate and independent unconstitutional provisions in the statute, which may be rejected, and the rest of the act be permitted to stand and have effect according to the legislative intent, the valid portions must be upheld. But if an unconstitutional element pervades the entire statute as an inherent and essential part, it must fail as an entirety. In such a case it does not avail that the officer charged with the execution of the law may not enforce it according to its terms, but only as he may deem wise and expedient. Assent cannot be given, under such circumstances, to the proposition that, although a statute may authorize the accomplishing of an unconstitutional purpose, it must, nevertheless, be presumed that it will, in fact, only be used to accomplish what can be done in accordance with the Constitution. Taylor v. Commissioners, 23 Ohio St. 22, 33, 34; Alabama & N. O. Transp. Co. v. Doyle (D. C.) 210 Fed. 181; Bracey v. Darst (D. C.) 218 Fed. 491, 492; People v. Warden, 144 N. Y. 529, 539, 39 N. E. 686, 27 L. R. A. 718.

Because a certificate of stock is only evidence of the ownership of shares, the interest represented by them being held by the company for the benefit of the true owner (Citizens' Sav. & Tr. Co. v. Ill. Cent. R. R., 205 U. S. 46, 57, 27 Sup. Ct. 425, 51 L. Ed. 703; Ball v. Mfg. Co., 67 Ohio St. 306, 314, 65 N. E. 1015, 93 Am. St. Rep. 682), it does not follow, as defendants' counsel contend, that such certificate is of less value than an unprinted sheet of paper of corresponding size and quality, and that it cannot therefore be a subject of interstate commerce. If it be but written evidence of an interest in corporate property, the same may be said of·notes and bills, which are mere evi-

dence of indebtedness on the part of individuals or corporations that issue them. In Merritt v. American Steel-Barge Co., 79 Fed. 228, 235, 24 C. C. A. 530 (C. C. A. 8), in speaking of stock certificates, it was said that:

"In the business world such obligations or securities are treated as something more than mere muniments of title. They are daily bought and sold like ordinary chattels, they may be hypothecated or pledged, they have an inherent market value, and, while differing in some respects from chattels, they are generally classified as personal property."

In Ohio a stock certificate is so far property that it may be seized by an officer making an attachment or levy. Section 8673-13, G. C. (See Page & A. Gen. Code.)

[5] A state law, which, in its essentials, is a legitimate exercise of the police power, is not rendered invalid by reason of the fact that interstate commerce is thereby incidentally affected; but, if such law directly burdens such commerce, although expressed to be a regulation under the state police powers, it must be held to be unconstitutional, for the reason that the power to regulate commerce between the states is vested in Congress. Arnold v. Yanders, 56 Ohio St. 417, 421, 47 N. E. 50, 60 Am. St. Rep. 753; Re Oscar Julius, 4 Ohio Cir. Ct. (N. S.) 604, 609; Mugler v. Kansas, 123 U. S. 623, 661, 8 Sup. Ct. 273, 31 L. Ed. 205; Austin v. Tennessee, 179 U. S. 343, 344, 21 Sup. Ct. 132, 45 L. Ed. 224.

[6] Utterances emanating from the Supreme Court and express rulings by lower federal courts establish beyond all reasonable controversy that stocks and bonds, securities whose disposition is subject to the provisions of the act, are articles of legitimate interstate commerce. Bracey v. Darst (D. C.) 218 Fed. 495, 496; Compton v. Allen (D. C.) 216 Fed. 546. Sales of them as between the states, and their transmission from one state to another, whether through the mails or the instrumentality of common carriers, constitute interstate commerce. Sales may be and are effected by telegraph, telephone, correspondence, traveling salesmen, and the issuers or investment companies directly or through their local or branch houses. The securities may be delivered by such salesmen or branch houses at the times sales are made or subscriptions taken, or by the issuers or investment companies by means of any of the known and usual agencies for transmitting such instruments from one state to another.

Whether interstate transactions in the securities whose disposition is within the purview of the act directly burden interstate commerce must be determined by testing its provisions by the federal Constitution. The act (section 6373-3) requires as a condition precedent to the authorization and right of an applicant to do business in the state that such applicant shall submit, with a filing fee of $5, to the commissioner: (a) The names and addresses of the applicant's directors and officers, if the applicant be a corporation or association, and of all partners, if it be a partnership, and of the individual, if it be such, and also the names and addresses of all agents of such applicant, assisting or about to assist in the disposition of securities; (b) the location of its principal office without and within the state, if it have both;

and (c) the general plan and character of its business, and references as to its suitability to transact such business, which references the commissioner "shall confirm by such investigation as he may deem necessary, establishing the good repute in business of such applicant's directors, officers and agents." If the applicant be a foreign corporation, having its principal place of business beyond the boundaries of the state, it must also file a duly certified copy of its articles of incorporation, regulations and by-laws, and, if it be an unincorporated association, a certified copy of its articles of association or deed of settlement. Every applicant must also submit to the commissioner an irrevocable written consent to litigate in the courts of Franklin county only any action brought against him on account of any fraudulent disposal of securities by him or his agents, and also to be bound by service of process made personally or by registered mail. Notice of all applications for registration as a licensed dealer in securities must be published at the expense of the applicant in a daily newspaper of general circulation, and a further payment of an annual fee of $50 is exacted should a license be issued. An amended license is necessary whenever the name of an agent is added to or stricken from the original, a payment of $5 being exacted in the first instance and of $2 in the latter. Notice of each amendment to the license must be published at the licensee's expense. The commissioner may at any time revoke any license or refuse to renew the same upon ascertaining—the manner of which is not stated—that the licensee is of bad business repute, has violated any provision of the act, or has engaged, or is about to engage, under favor of such license, in illegitimate business or fraudulent transactions. He is required to give at least five days' notice of his intention to revoke or to refuse to renew or grant a license, but the licensee or applicant, as the case may be, is not accorded a hearing. Following the refusal or revocation of a license, the applicant or licensee, as the case may be, may contest in the Franklin county court the correctness of the commissioner's ruling, but must assume the burden of disproving the grounds assigned as the basis of his official action, and must also meet any additional reasons which the commissioner may plead in justification.

Notwithstanding the granting of a license to an applicant, it may not dispose of any given securities until it has also filed, unless excused by the commissioner from so doing, a further statement (section 6373-9) touching the issuer of such securities, if the issuer be a company, setting forth (a) its name and the location of its principal office and the names of its officers and directors, or, if it be a copartnership, the names of the partners; (b) a general detailed showing of its assets, liabilities, and capital stock, as of a date not later than the close of the last fiscal year, and also of its gross income, expenses, and fixed charges for the year last prior thereto, or for such other time as the issuer has been in business, if that time be longer than a year; (c) a pertinent description of such securities and the purpose of their issue; and (d) the approximate price at which the licensee proposes to dispose of them. The exemptions from the filing of the information called for by such section which the statute permits the commissioner

to grant are enumerated in section 6373-10. In most instances they are so qualified as to relieve but a limited number of licensees and introduce a fatal inequality as regards the protection of the laws guaranteed by the Fourteenth Amendment.

The statute further provides that no issuer or underwriter, nor any person or company acting in behalf of either (section 6373–14), shall, within the state, for the purpose of organizing or promoting any company or of assisting in the flotation of its securities, dispose or attempt to dispose of any such securities until the commissioner has issued a certificate permitting such to be done, the granting of which must be subsequent to the issuer or underwriter filing an application (except in certain instances which need not now be noted), with a fee of $5, containing the information required by paragraphs (a), (b), (c) and (d) of section 6373–9, a certified copy of the issuer's articles of incorporation or association, regulations and by-laws, of all minutes of stockholders and directors relative to the issuance of such securities, of any contracts which have been made between the issuer and its underwriter of such securities (copies of all such subsequent contracts also to be filed when made), and of all contracts between any underwriter and any sales agent or broker, and also a sworn statement made by the president and secretary of the issuer showing in detail the items of cash, property, services, patents, good will, and any other consideration for which such securities have been or are to be issued in payment. The commissioner (section 6373–16) may, as he deems advisable, examine the issuer of such last-named securities at any time, both before and after his grant of the certificate named in section 6373–14. In the exercise of his discretion, he may require all or any part of the expense of such examination to be borne by the applicant, who is compelled to deposit with him in advance for such purpose whatever sum he may order. The applicant receives an itemized statement of expenditures made, but this follows the conclusion of the examination. If the commissioner finds that the applicant has complied with the law, is not fraudulently conducting its business, is not proposing to dispose of its securities on grossly unfair terms and is solvent, a certificate authorizing the disposal of such securities shall issue, providing, except in case of a licensed dealer, a fee of $10 be paid; but, if the commissioner does not affirmatively so find, the certificate must be refused. It must be issued or denied within a reasonable time after application for it is made, which time shall be within 30 days after the applicant or certificate holder, whose certificate has been revoked, has fully complied with all the requirements of the act; but as the commissioner is the sole judge of what constitutes compliance, and as the examination, especially of large concerns, would in some instances be prolonged and at times have to be conducted at distant points in this or another country, the issuing of a certificate may be delayed indefinitely and beyond the 30-day period. After the applicant is authorized to proceed with its proposed business, the commissioner may still revoke its certificate and deny it the privilege of continuing to dispose of the securities in question, if he has reason to believe that the certificate holder's business is fraudulently conducted,

or that the securities are disposed of upon grossly unfair terms, or that the issuer is insolvent, the right to review his action being again restricted to the Franklin county court. Whether such "reason to believe" shall be the result of an orderly examination of the issuer's conduct and affairs, or be otherwise acquired, does not appear.

Violation of the act constitutes a misdemeanor or felony, regard being had to the character of the offense, and is visited by a fine or imprisonment, or both.

[7] In International Text-Book Co. v. Pigg, 217 U. S. 91, 30 Sup. Ct. 481, 54 L. Ed. 678, 27 L. R. A. (N. S.) 493, 18 Ann. Cas. 1103, and Buck Stove Co. v. Vickers, 226 U. S. 205, 213–216, 33 Sup. Ct. 41, 57 L. Ed. 189, a Kansas statute, akin to the Ohio act, but less drastic, was held to impose a direct burden on legitimate interstate commerce, and to be violative of the commerce clause of the federal Constitution, not only on account of the license required as a condition precedent to the right to transact a lawful business, but because it is not competent for a state Legislature to prescribe, as a condition of the right of a foreign corporation to engage in legitimate interstate transactions, that it should prepare a statement as required, as to its stock authorized and paid-up and its par and market value, as to its assets, liabilities, officers, trustees, directors, manager, and stockholders, with a showing of the stockholdings of each of the latter and the amount paid on his holdings, and the post office address of all of such above-named persons. A quite similar but (as regards the parties at whom it was aimed) a more comprehensive statute, in that it ran, not only against express or transportation companies incorporated by any foreign government, but, like the present act, also against any association or partnership acting under the laws of any foreign government, was likewise denounced in Crutcher v. Kentucky, 141 U. S. 47, 11 Sup. Ct. 851, 35 L. Ed. 649, in a well-reasoned opinion which is freely quoted in the Pigg Case.

The draughtsman of the act here in question, unwittingly, no doubt, but with strange fatality, incorporated into it substantially all of the vices of the statutes considered in the above-named cases, and added others equally, if not more, obnoxious. The burdens which it imposes on interstate commerce are so direct, positive and substantial as. to lend peculiar force to the rule announced in the Pigg, Vickers, and Crutcher Cases, and to vitiate the entire act for the reason that its constitutionally offensive features are so distributed through its various parts as to be inseparable. The enforced suspension from all business activity for a period of 30 days, imposed by the original Michigan act, was held to be a fatal "30-day paralysis." In the later decision rendered by the same court (Halsey & Co. v. Merrick) the subsequent act of that state was overthrown, notwithstanding the absence of such restrictive provision. In the present act the prohibition from the transaction of business must extend for a week, and possibly 20 or 30 days, or more; it therefore offends against the Constitution quite as much as the first of the Michigan acts.

[8] The act must be further tested by its effect upon the citizen's right to pursue a lawful calling. The natural right to life, liberty and

the pursuit of happiness is not an absolute right. It must yield whenever the concession is demanded by the public welfare, health or prosperity. But, however viewed, the act transcends the legitimate exercise of the police power and violates the due process clause of the Constitution. There is a fundamental distinction between what Mr. Justice Bradley termed, in Butchers' Union Co. v. Crescent City Co., 111 U. S. 746, 763, 4 Sup. Ct. 652, 28 L. Ed. 585, the ordinary occupations and pursuits of life, forming the large mass of industrial avocations which are and ought to be free and open to all, subject only to such general regulations, applying equally to all, as the general good may demand, and the kinds of business and transactions which are affected by a public interest or arise from public grant or exist by public sufferance. Of this latter class are the liquor traffic, grain elevators, innkeepers, warehouses, itinerant peddlers, insurance, motion picture shows, concerns exercising public franchises, and the like, all of which it is competent for the state lawmaking power to regulate and within proper bounds subject to executive license and control, as the interests of society may require. To the former class, with which alone we are now dealing, belongs the right in good faith to buy and sell securities and to fix their price by agreement, either in individual transactions or in the course of repeated and successive transactions of a similar character, a right which, when so exercised, is both property and liberty, and which cannot be made subject to either executive grant or denial. City of Cleveland v. Construction Co., 67 Ohio St. 197, 219, 65 N. E. 885, 59 L. R. A. 775, 93 Am. St. Rep. 670. In Allgeyer v. Louisiana, 165 U. S. 578, 589, 17 Sup. Ct. 427, 41 L. Ed. 832, it was said that the liberty mentioned in the Fourteenth Amendment embraces—

"the right of the citizen to be free in the enjoyment of all his faculties, to be free to use them in all lawful ways, to live and work where he will, to earn his livelihood by any lawful calling, to pursue any livelihood or avocation, and for that purpose to enter into all contracts which may be proper, necessary and essential to his carrying out to a successful conclusion the purposes above mentioned."

If an issuer or owner of or dealer in securities issued in good faith, and based on value fairly commensurate with their face or selling value, is deprived of the right of disposal or of offering them for disposal, he is deprived, not only of his property, within the meaning of the Constitution, by taking from him one of the incidents of ownership (City of Chicago v. Netcher, 183 Ill. 104, 110, 55 N. E. 707, 48 L. R. A. 261, 75 Am. St. Rep. 93), but also of his liberty, as appears from Mr. Justice Matthews' saying in Yick Wo v. Hopkins, 118 U. S. 356, 370, 6 Sup. Ct. 1064, 1071 [30 L. Ed. 220], that:

"The very idea that one man may be compelled to hold his life, or the means of living, or any material right essential to the enjoyment of life, at the mere will of another seems to be intolerable in any country where freedom prevails, as being the essence of slavery itself."

Legitimate commercial transactions, such as the disposal of securities of the kind above mentioned, cannot be regulated by legislative enactment. The act in question seeks to regulate private transactions,

but the person, natural or artificial, that sells securities based upon reasonable value, is entitled to the protection of the same safeguards as the man who sells clothing, dry goods, groceries, or hardware, or engages in any other private business that is not affected by a public interest. As was fittingly said in the Doyle Case, 210 Fed. 179:

"The issuing of * * * stocks or bonds by a private company to get money for its own business no one can suppose is a public or quasi public enterprise; the business of buying and selling stocks and bonds and other securities is no more 'affected by a public interest' than is the business of buying and selling groceries. When we thus recall that the prohibition applies to a private business, the question at once presents itself whether frauds and opportunities for fraud sufficiently characterize the business to justify its entire prohibition save under drastic restrictions."

Every proposed offering of securities must first be submitted to the commissioner, subject to the delay incident to his investigation or examination, which, should he temporarily grant a license or a certificate, may thereafter be continued and repeated, and in case of an issuer mentioned in section 6373–16, at its expense, limited only by his unrestrained discretion. Every investigation and examination authorized is ex parte. The applicant, whether a dealer or issuer, is not permitted to be heard as to the granting or revocation of a license or the award of a certificate, on the important questions of his own good repute, his alleged or surmised violations of the provisions of the statute, the legitimacy of his business, the honesty of his conduct, the fairness of the terms under which his disposals are made, or his own solvency. No rules of procedure are prescribed in accordance with which the investigation or examination shall be made, nor is the commissioner required to establish any rule or regulation as to what shall constitute good repute, solvency, or fraudulent conduct. He may at will deal with each case as it arises and vary his course to suit his pleasure. He is at liberty to hear, if he chooses, only evidence unfavorable to the investigated party. None of it need be safeguarded by an oath. The uncontrolled discretion, and even the whim and caprice (if he gives them play), of the commissioner or of his assistant (subject to the commissioner's supervision), may not only halt, but injure and perhaps destroy, a worthy business enterprise and cast a cloud on the name of the applicant or licensee, and when such applicant or licensee seeks redress in the courts he must assume the burden of disproving the findings made against him, however groundless they may be. Even an effort is in effect made to deny him access to the federal courts. Butler Bros. Shoe Co. v. U. S. Rubber Co., 156 Fed. 1, 84 C. C. A. 167 (C. C. A. 8). In given respects the above-named law is more severe than that of any of the states whose "blue-sky" laws have been held unconstitutional. They afforded some opportunity, at least, to the applicant to be heard when his right to do business was under investigation, and, when his business and good name were assailed, opened to him the doors of all the courts of the state for redress against adverse rulings and limited the burden of cost to which he might be subjected in consequence of an examination into his affairs.

[9-11] A police regulation, like any other law, is subject to the equal protection clause of the Fourteenth Amendment. Atchison &

Santa Fé Ry. Co. v. Vosburg, 238 U. S. 56, 59, 35 Sup. Ct. 675, 59 L. Ed. 1199, L. R. A. 1915E, 953. A statute does not deny the equal protection of the law if all persons brought under its influence are treated alike under the same conditions (Missouri Pac. Ry. Co. v. Mackey, 127 U. S. 205, 209, 8 Sup. Ct. 1161, 32 L. Ed. 107), and if it does not subject the individual to an arbitrary exercise of the powers of government (Duncan v. Missouri, 152 U. S. 377, 382, 14 Sup. Ct. 570, 38 L. Ed. 485). The following illustrates instances wherein the act fails to meet the test thus prescribed:

If more than 50 per cent. of the bonds of a given issue by a corporation are included in a sale to one purchaser, such issue is not embraced within the act. Section 6373–2 (1), as amended by 104 Ohio Laws, p. 110. The residue of the bonds, whether worthless or of value, may be sold without the supervision which the law provides. Another corporation of similar or precisely the same character, having no single purchaser for a majority of its bonds, is subjected to the onerous provisions of the law, although its securities may be of the highest financial character. An owner who is not the issuer of the securities he holds is at liberty to dispose of his holdings for his own account regardless of the statute, providing he can do so without resorting to repeated and successive transactions of a similar character; but, if such transactions are expedient or necessary, he may not sell, unless, at inconvenience and financial cost and through delay and the commissioner's approving stamp of "good repute in business," he obtains a dealer's license so to do. A natural person, who has not underwritten and is a bona fide owner of his securities, whether he be of good repute or not in business, may dispose of them for his own account; but the underwriter, although he may possess the same moral qualities and wealth as the natural person, or outrank him in both of these respects, may not dispose of his holdings, except by compliance with the none too clear provisions of the act. Although a natural person may dispose of his holdings as above indicated, a partnership or association may not do so. The exemptions based on market reports of a daily newspaper of general circulation (section 6373–10 [b] and [a]) would fail to embrace large numbers of meritorious issuers of the different classes of securities, for it is well known that many securities are not listed on the market or mentioned in any standard manual of information. Section 6373–10 (c) can have no application to an issuer, if some disposee is found who in a single transaction acquires securities of a given issue to the amount of $5,000 or more. There are many worthy concerns, each capitalized for a considerable sum, in which no one's investment reaches that amount. There would, moreover, seem to be no reason why, if some one person who, risking that sum, should be defrauded, others should be cheated of smaller sums by sales of stock without the supervision which the law is intended to provide. A licensee may be relieved from giving information concerning the issuer of securities (section 6373–10 [f]), if the disposal of such securities is at a commission of less than 1 per cent. of their par value through a licensed member of a regularly organized and recognized stock exchange, having an established and lawfully conducted place

of business in the state regularly open for public patronage, of all of which the commissioner is the sole judge. He may not be thus relieved, if the disposal is made by any one else.

[12, 13] The above observations upon the act have been made with full appreciation of section 2, art. 13, of the Ohio Constitution as amended September 3, 1912, the pertinent portion of which provides:

"Corporations may be classified and there may be conferred upon proper boards, commissioners or officers, such supervisory and regulatory powers over their organization, business and issue and sale of stocks and securities, and over the business and sale of the stocks and securities of foreign corporations and joint stock companies in this state, as may be prescribed by law."

It is to be regretted that the Supreme Court of Ohio has not been called upon either to construe this provision or to pass upon the statute now under consideration; nor have we had the benefit of the discussion of this constitutional provision by counsel. We are, however, impressed with the belief that the provision cannot be so construed as to change the conclusions we have reached concerning the operation and effect of the statute. The effect of the constitutional provision, in our judgment, is simply to give distinct expression to powers which were plainly implied under the same section and article of the Constitution of 1851, which provided that:

"Corporations may be formed under general laws; but all such laws may, from time to time, be altered or repealed."

It is settled by Berea College v. Kentucky, 211 U. S. 45, 57, 29 Sup. Ct. 33, 35 [53 L. Ed. 81], that:

"A power reserved to the Legislature to alter, amend or repeal a charter authorizes it to make any alteration or amendment of a charter granted subject to it, which will not defeat or substantially impair the object of the grant, or any rights vested under it, and which the Legislature may deem necessary to secure either that object or any public right. Commissioners on Inland Fisheries v. Holyoke Water Power Co., 104 Mass. 446, 451 [6 Am. Rep. 247]; Holyoke Co. v. Lyman, 15 Wall. 500, 522 [21 L. Ed. 133]; Close v. Glenwood Cemetery, 107 U. S. 466, 476 [2 Sup. Ct. 267, 27 L. Ed. 408]."

It was there further held that, while the language of a statute may not in terms amend a charter, yet, where such appears to have been the legislative intent, the statute will be regarded as an amendment; Mr. Justice Brewer saying (page 57 of 211 U. S., page 35 of 29 Sup. Ct. [53 L. Ed. 81]):

"It would be resting too much on mere form to hold that a statute which in effect works a change in the terms of the charter is not to be considered as an amendment, because not so designated."

It is also settled that, where such power to alter or repeal a charter is reserved, it is competent for the Legislature to repeal the charter as well as to amend it. Greenwood v. Freight Co., 105 U. S. 13, 26 L. Ed. 961; Hamilton Gaslight & Coke Co. v. Hamilton City, 146 U. S. 258, 269, 270, 271, 13 Sup. Ct. 90, 36 L. Ed. 963; Shields v. State, 26 Ohio St. 86, 93, 94, affirmed 95 U. S. 316, 324, 24 L. Ed. 357; State v. City of Hamilton, 47 Ohio St. 52, 73, 74, 23 N. E. 935. The most, then, that can be said of the statute in question is that its provisions operate to amend the articles of incorporation, the charters,

of all domestic corporations that are in terms affected by the provisions of the act. It inevitably follows that these reserved powers include the power to supervise and regulate corporations. The consideration, then, of the present statute cannot be aided upon any theory that section 2, art. 13, as amended, vests in the state Legislature any greater power than it possessed under the old section and article; for manifestly there can be no difference between an express power and an implied power to do the same thing. It results that the constitutional validity of the present statute is to be tested by considerations practically the same as it would have been prior to the amendment in question. For example, a state is without power either through constitutional or statutory provision to avoid the effect and force of the commerce clause of the federal Constitution; it hardly need be said that the statutory provisions before pointed out, which directly impose burdens upon interstate commerce, are of necessity violative of that clause; and, apart from everything else, it cannot be presumed that the Legislature would have enacted the statute if it had understood that the provisions aimed against foreign corporations could not be sustained, since this alone would work an obvious discrimination against domestic corporations.

Again, the power to supervise and regulate the business here involved was never before and cannot now be understood to signify authority so to burden the business of domestic corporations as in practical effect to destroy it, regardless of its actual character and merit. We are not to be understood by anything said in this opinion to intimate that it is not within the power of the state Legislature reasonably to regulate the business of corporations of its own creation or that of foreign corporations and joint-stock companies which are operating within the borders of the state (Alabama & N. O. Transp. Co. v. Doyle [D. C.] 210 Fed. 186, 187; Bracey v. Darst [D. C.] 218 Fed. 494, 495); such power of regulation being more extensive as to such artificial entities than as to individuals, copartnerships and voluntary associations. We do mean, however, to say, as we have already in effect stated, that the things attempted to be done by the present statute cannot be sanctioned under the guise of "supervisory and regulatory" measures in respect of the business of issuing and selling stocks and securities, whether of domestic or foreign corporations.

Other features of the act and other points argued have been considered; the treatment of the one and the discussion of the other would prolong this lengthy opinion and are not necessary.

The licenses mentioned in the first two of the above-entitled causes expired on December 31, 1915. No occasion, therefore, exists for enjoining their cancellation. The bill in each of them is drawn on narrow lines. The prayer of each, however, taken in conjunction with certain averments, is such as to warrant the temporary enjoining of the defendants therein named against enforcing or attempting to enforce the statute in question. In the third of the above cases, the motion filed by the defendants to dismiss is overruled. A temporary injunction is awarded in each case.